**MISC. 05 0169**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUL 14 2005  ★

LONG ISLAND OFFICE

-------------------------------------------X
                                           )
IN RE: Request from Belgium Pursuant       )        No.___
       to the Treaty Between the           )
       United States of America            )
       And the Kingdom of Belgium          )
       On Mutual Legal Assistance in       )
       Criminal Matters for Assistance     )
       in the Criminal Matter of           )
       Antoine Mekri                       )        **SEYBERT, J.**
-------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an Order appointing a

Commissioner to collect evidence requested by Belgium in its

attached Treaty Request made pursuant to the Treaty between the

United States of America and the Belgian Kingdom on Mutual Legal

Assistance in Criminal Matters, October 24, 1989, ___ U.S.T. ___,

(hereinafter referred to as "the Treaty"). A treaty constitutes

the law of the land. U.S. Const. art. VI. The provisions of a

treaty have equal footing with acts of Congress and are binding

on the courts. Asakura v. City of Seattle, Washington, 265 U.S.

332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801).

To the extent that the provisions of a treaty are inconsistent

with a preexisting statutory provision, the treaty supersedes the

statute. United States v. Erato, 2 F.3d 11, 15-16 (2d Cir.

1993).

A.    The Treaty

          The United States and Belgium entered into the Treaty

for the purpose of promoting mutual legal cooperation in criminal

matters.    The Treaty obliges each state to provide assistance to

the other in investigations of offenses covered under the Treaty

and in court proceedings related to such offenses.    Article 1(1).

The assistance includes interviews and depositions of witnesses,

production of documents and other things, and asset freezes.

Article 1(2); see Barr v. U. S. Department of Justice, 645 F.

Supp. 235, 237 (E.D.N.Y. 1986), aff'd, 819 F.2d 25 (2d Cir.

1987).

B.    Use of the Treaty to Execute Requests for Assistance

          In executing Belgian requests, the Treaty obligates

courts to follow its domestic law and procedures except to the

extent that the Treaty provides otherwise.    The Treaty states, at

Article 16 (2), that:

> Requests shall be executed according to the domestic laws
> and procedures of the Requested State except to the extent
> that this Treaty provides otherwise.    Procedures specified
> in the request, even if unfamiliar to the Requested State,
> shall be followed except to the extent specifically
> prohibited by the laws of the Requested State.

          As stated in the Letter of Submittal to the President

from the Department of State dated March 11, 1988, the Treaty is

intended to be self-executing but, for the most part, will

"utilize existing authority of the federal courts, particularly

28 U.S.C. 1782." Consequently, federal district courts routinely

utilize the "commission" procedure authorized by 28 U.S.C. §

1782, the statute governing the provision of assistance for

foreign judicial proceedings generally, to fulfill their judicial

responsibility under the Treaty of executing Belgian requests.

1.    Appointment of a commissioner

Section 1782 provides in pertinent part that:

> The district court . . . may direct that the
> testimony or statement [of a person who
> resides or is found within the district] be
> given or the document or other thing be
> produced, before a person appointed by the
> court.

A federal district court customarily appoints or "commissions" a

person ("commissioner") to collect evidence on behalf of the

court and authorizes the commissioner to submit the evidence

collected to the requesting foreign court or authority.   With

requests for assistance in criminal matters, a court typically

appoints an Assistant United States Attorney as commissioner.

However, a court also may commission a foreign authority together

with (or in lieu of) an Assistant United States Attorney.  See,

e.g., In re Letter of Request from the Supreme Court of Hong

Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991) (hereinafter Hong Kong).

Application to a federal district court for appointment

of a commissioner to execute a foreign request for judicial

assistance is handled ex parte.  In re Letter of Request from the

Crown Prosecution Service of the United Kingdom, 870 F.2d 686,
688 (D.C. Cir. 1989); In re Letters Rogatory from the Tokyo
District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).

  2.   Establishment of an evidence-collecting procedure

       Section 1782 further provides in pertinent part that:

       To the extent that the order does not
       prescribe otherwise, the testimony or
       statement shall be taken, and the document or
       other thing produced, in accordance with the
       Federal Rules of Civil Procedure.

A federal district court empowers a commissioner to collect the
evidence using the procedure prescribed by the court.  A court
has "complete discretion in prescribing the procedure to be
followed."  Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964),
reprinted in 1964 U.S. Code Cong. & Admin. News 3782, 3789.  When
a court's order fails to specify a procedure by which a
commissioner is to collect the evidence, the Federal Rules of
Civil Procedure apply.  In re: Letters Rogatory from the Tokyo
District Prosecutor's Office, Tokyo, Japan, 16 F.3d 1016 (9th
Cir. 1994); Hong Kong, 138 F.R.D. at 32.  However, as Section
1782 makes clear, when a court does specify a procedure other
than one in accordance with the Federal Rules of Civil Procedure,
the alternative procedure shall apply.  In re Letter of Request
from the Government of France, 139 F.R.D. 588, 590-591 (S.D.N.Y.
1991).

As summarized in the Letter of Submittal to the
President from the Department of State dated March 11, 1988, the
Treaty requires courts to order the use of procedures comparable
to those applicable in domestic investigations and prosecutions
of criminal matters rather than, by default, the Federal Rules of
Civil Procedure.

    a.   Commissioner's subpoena

The Treaty contemplates that federal district courts
will use compulsory measures to execute Belgian requests.   The
Treaty provides, at Article 6(1), that:

> A person from whom evidence is sought shall, if
> necessary, be compelled by subpoena to appear and
> testify or produce documents, records and articles to
> the same extent as in investigations or proceedings in
> the Requested State.

If a federal district court so orders, a commissioner may use the
attached form, entitled commissioner's subpoena, to obtain the
requested evidence.   See, e.g., United States v. Erato, 2 F.3d
11, 12-13 (2d Cir. 1993) (incorporating in pertinent part the
district court's order directing the use of commissioner's
subpoenas).   The commissioner's subpoena is a creation of neither
the Federal Rules of Criminal Procedure nor the Federal Rules of
Civil Procedure, but is an order of the court for the production
of evidence in accordance with both the Treaty and Section 1782.
See Article 6(1); 28 U.S.C. 1651.   Upon authorization by a court,
a commissioner may issue such commissioner's subpoenas as are

necessary to execute the request.

      b.   Notice of evidence taking

Inasmuch as grand jury and criminal trial subpoenas are issued without notice to other than the recipients (i.e., no notice to targets, defendants, or third parties), commissioner subpoenas issued in execution of Belgian requests likewise should require no notice to other than the recipients. Accordingly, a federal district court should authorize a commissioner to collect the evidence requested without notice to any party other than the recipient of the commissioner's subpoena except to the extent that a Dutch request asks for specific notice procedures.[1]

C.  The Present Request

The instant Treaty Request has been made by the Belgian Ministry of Justice, the Central Authority under Article 17 of the Treaty, in connection with a current criminal investigation

---

[1] Historically, United States authorities have executed requests for judicial assistance in criminal matters without notification to actual or potential targets of investigations, or even to parties in proceedings, in order to protect against compromising foreign investigations and proceedings. Moreover, United States authorities customarily rely on the requesting courts and authorities to provide such notice directly to the relevant parties as foreign law requires. Finally, requesting courts and authorities routinely request that United States executing authorities follow particular, stated notice procedures when such procedures are necessary or useful under the foreign law or practice. For example, foreign requests frequently ask (1) that a person to be interviewed (generally a defendant or suspect) be given notice of applicable testimonial privileges (e.g., against self-incrimination) at the time of the interview and (2) that a defendant and defense counsel be permitted to be present during the taking of testimony of a witness and be given sufficient notice to make arrangements.

by the Investigating Magistrate at the Court of First Instance, in Antwerp, Belgium. As stated in Article 17(2)(a), the term "Central Authority" means the "Minister or Justice or his representative or delegate" for the Kingdom of Belgium.

The Investigating Magistrate at the Court of First Instance, in Antwerp, Belgium is investigating Antoine Mekri, the head of the OXET Corporation Ltd., for fraud in connection with a purchase of approximately $5,540,643.96 worth of pharmaceutical drugs from Cilag International. The drugs were shipped from New York to Antwerp on January 30, 2002 and stored with another company, F.J. Tytherleigh ("Tytherleigh"). Cilag demanded payment from OXET. OXET never paid and Cilag demanded return of the drugs. Tytherleigh informed Cilag that they shipped the drugs to three locations: S.T.C. Trading Company, Ronkonkoma, New York; Finel Express Truckline, Miami, Florida; and Container Care International, Hialeah, Florida. The Investigating Magistrate at the Court of First Instance has asked for assistance in obtaining an interview with personnel from S.T.C. Trading Company at 2060 Ninth Avenue, Ronkonkoma, New York.

Accordingly, to execute this request, the government moves this Court to issue the attached Order appointing Assistant United States Attorney Mark J. Lesko as Commissioner, authorizing him to take the actions necessary, including the issuance of Commissioner's subpoenas, to obtain the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in the Belgium.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

By:

Mark J. Lesko
Assistant United States Attorney
(631)715-7868

**TREATY ON MUTUAL ASSISTANCE IN CRIMINAL MATTERS**

**United States Mutual Legal Assistance Treaty With Belgium**
**100-16**
January 28, 1988

TREATY WITH BELGIUM ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

TREATY DOC. 100-16

January 28, 1988, Date-Signed

STATUS:
[*1] PENDING: March 29, 1988. Treaty was read the first time, and together with the accompanying papers,
referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE KINGDOM OF BELGIUM ON
MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT WASHINGTON ON JANUARY 28, 1988

TEXT:
100TH CONGRESS

SENATE

LETTER OF TRANSMITTAL

THE WHITE HOUSE, March 29, 1988.
To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty
between the United States of America and the Kingdom of Belgium on Mutual Legal Assistance in Criminal
Matters, signed at Washington on January 28, 1988. I transmit also, for the information of the Senate, the
report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United
States in order to counter more effectively criminal activities. The Treaty should be an effective tool to
prosecute a wide variety of modern criminals including members [*2] of drug cartels, "white-collar criminals,"
and terrorists. The Treaty is self-executing and utilizes existing statutory authority.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under

the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents,

records, and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents;

and (5) the provision of assistance in locating, tracing, immobilizing, seizing, and forfeiting proceeds of crime,

and restitution to the victims of crime.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and

consent to ratification.

RONALD REAGAN.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE, Washington, March 11, 1988.


The PRESIDENT.

I have the honor to submit to you the Treaty between the United States of America and the Kingdom of

Belgium on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Washington on January

28, 1988. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal [*3] assistance in criminal matters. In recent years, similar bilateral

treaties have entered into force with Italy, the Netherlands, Switzerland and Turkey; and others have been

concluded (but not yet entered into force) with the Bahamas, Canada, Colombia, Morocco, Mexico, Thailand,

and the United Kingdom on behalf of the Cayman Islands. The Treaty contains many provisions similar to those

in the other treaties as well as some innovations.

The Treaty will not require implementing legislation and will utilize the existing authority of the Federal courts,

particularly 28 U.S.C. 1782.

Article 1 provides for assistance in "all matters relating to the investigation, prosecution and suppression of

offenses." The Treaty thereby provides for assistance at the investigative stage (such as grand jury

proceedings), as well as after formal charges have been filed. The article states that, except as otherwise

provided by the Treaty, assistance shall be provided for any offense under the laws of the Requesting State.

Assistance under the Treaty will include: provision of documents, records and evidence; executing requests

for searches and seizures; obtaining witness [*4] testimony; and other forms of assistance. The article
explicitly states that it is not intended to create rights in private parties either to gather evidence or secure
other assistance or to suppress or exclude in civil or criminal proceedings evidence obtained under the Treaty.

Article 2 requires the Requested State to make thorough efforts to ascertain the location or identity of
persons, such as witnesses or suspects, specified in the request.

Article 3 obligates the Requested State to effect service of any legal document at the request of the other
State. The article also requires that any request for service of a document requiring the appearance of a
person be transmitted to the Requested State a reasonable time before the scheduled appearance. Finally, it
provides that the Requested State return as proof of service a dated receipt signed by the person served or a
declaration by the officer effecting service stating the form and date of service.

Article 4 provides that when a Requesting State considers the appearance of a witness or expert before its
judicial authorities particularly necessary, it may request such an appearance, and the Requested State is
required to invite [*5] that person's appearance in the Requesting State. The Requested State is obligated
promptly to inform the Requesting State of the person's reply. The article also provides that the Requesting
State reimburse appropriately the witness or expert for travel expenses and subsistence in complying with the
request and may, upon the person's request, provide an advance for such expenses and subsistence. The
article provides that, even if a summons to any such witness or expert contains a notice of penalty, a witness
or expert whose appearance is requested in the Requesting State shall not be subjected to any punishment or
restraint in the Requested State.

Article 5 obligates the Requested State to provide to the Requesting State publicly available information and
items, including documents or records, in the possession of a government office or agency. The article also
authorizes the Requested State to make available to the Requesting State information and items which are not
publicly available to the same extent and under the same conditions as would be available to its law
enforcement or judicial authorities or in its discretion to deny the request entirely or in part.

Article 6 states [*6] that the Requested State shall, if necessary and to the same extent as in investigations or proceedings in the Requested State, compel a person to appear and to testify or to produce

items, including documents, records and articles of evidence. The article provides that, though the testimonial

privileges available under the law of the Requesting State will not be considered in the execution of the

request, any such claim of privilege shall be noted in the record. The article also provides the Requested State

shall specifiy the date and place of the taking of testimony and that the Requested State shall permit the

presence of the accused, counsel for the accused or of any other interested person specified in the request,

and shall provide any such person the opportunity to formulate questions in accordance with the procedures

applicable in the Requested State.

Article 7 obligates each State to the extent permitted under its laws to execute requests for search, seizure

and delivery of all items to the Requesting State; it also provides that such requests shall be executed in

accordance with the laws of the Requested State. Paragraph 2 concerns surrender of items and return.

Paragraph [*7] 3 provides that the rights of third parties to such items shall be duly respected.

Article 8 establishes a mechanism for ensuring the admissibility of the items produced or seized under the

Treaty, including provision of attestations in compliance with the form appended to this Treaty. It requires

that the Requested State follow the procedures requested by the Requesting State, except when prohibited

by the Requested State's laws, and in the event of special circumstances obligates the Central Authorities

defined in Article 17 to consult.

Article 9 provides that the Requesting State may, if the person in custody consents and the Requested State

has no reason to refuse, request the transfer to the Requesting State of a person in custody in the Requested

State. However, the Requested State may postpone the tranfer as long as the presence of the person is

necessary for an investigation or proceeding in the Requested State. The Requesting State must keep that

person in custody unless the Requested State has ordered release and shall return any person not released,

including nationals of the Requesting State, as soon as circumstances permit unless otherwise agreed.

Article 10 provides [*8] that the Requesting State may, if the person in custody consents and the
Requested State has no reason to refuse, request the transfer to the Requested State of a person in
custody
in the Requesting State. The Requested State must keep that person in custody unless the
Requesting State
has ordered release and shall return any person not released, including nationals of the Requested
State, as
soon as circumstances permit.

Article 11 provides for the deduction of time spent in custody in one State pursuant to a request
made under
the Treaty from the time remaining to be served in the other State. It also provides that a person
transferred
under the Treaty shall not be prosecuted or restrained in the State to which he has been
transferred for acts
or convictions prior to his transfer. The article also provides that any such immunity shall cease
if, for 15
consecutive days after the person has had an opportunity to leave, he has remained or, having
left, has
returned. If any such person escapes, the State to which he has been transferred shall make every
effort to
arrest him.

Article 12 requires that one Central Authority notify the other when it believes the proceeds of a
criminal
offense [*9] are in the territory of the other State. In addition, it provides that, to the extent
permitted by
their respective laws, the parties shall assist each other to locate, trace, immobilize, seize and
forfeit
proceeds of crime and to assure restitution to the victims of crime.

Article 13 sets forth the circumstances under which a party may deny assistance under the
Treaty, including
requests whose execution would prejudice the sovereignty, security or other essential public
interests of the
Requested State, and requests relating to military or political offenses. However, paragraph 2
makes clear that
assistance shall not be denied in respect of any offense the parties may consider not to be a
political offense
under any other international agreement to which they are parties. However, it also provides that
before
denying assistance on such grounds the Central Authority of the Requested State to consider
whether
assistance may be given subject to such conditions it deems necessary. If the Requesting State
accepts such
conditions, it shall comply with the conditions. The Requested State may also postpone
execution of request
or grant it subject to conditions if execution would interfere [*10] with an ongoing investigation

or

proceeding in that State. The Requested State is obligated to communicate to the Requesting State its

reasons for denying or postponing assistance as soon as possible.

Article 14 establishes procedures for ensuring the confidentiality of requests and their contents.

Article 15 sets forth the information which must be included in a request and the additional information which

must be included "to the extent necessary and possible."

Article 16 obligates the Central Authorities of each party to comply promptly with a request or, when

appropriate, to transmit a request for execution to the authority having jurisdiction to execute it. It also

states that the judicial authorities of the Requested State shall have jurisdiction to issue subpoenas, search

warrants or other orders necessary to execute a request. Except as otherwise provided by the Treaty,

requests shall be executed according to the laws and procedures of the Requested State. However, the

Requested State is required to follow the procedures specified in the request, even if unfamiliar to that State,

except to the extent specifically prohibited by the laws of the Requested State. Although copies [*11] of

requested items may be provided, the article further provides that, upon application, the Requested State

shall make every effort to furnish original items. The Requesting State shall return any items furnished as soon

as possible unless the Requested State waives their return.

Article 17 defines the Central Authorities for purposes of the Treaty. For the United States, the Central

Authority is the Attorney General or officials designated by him.

Article 18 of the Treaty establishes the basic rule that the Requested State shall render assistance without

cost to the Requesting State except for the fees of private experts authorized by the request and the costs

relating to the transfer of a person in custody, and provides for consultations in the event of expenses of an

extraordinary nature. It also provides that, while letters of transmission from one Central Authority to another

need not be translated, the Requesting State is obligated to provide a translation of its requests, and that

attachments to requests shall be translated as necessary.

Article 19 provides that the Treaty does not impede any assistance or procedure available under other

international conventions or arrangements [*12] or under the domestic laws or practices of the parties.

Article 20 provides that the Treaty shall enter into force on the first day of the second month after the

exchange of the instruments of ratification and provides for termination effective six months after written

notice of termination is given. It also makes clear that the Treaty shall apply to offenses committed before as

well as after it enters into force.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as

soon as possible.

Respectfully submitted.

GEORGE P. SHULTZ.

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE KINGDOM OF BELGIUM ON MUTUAL LEGAL
ASSISTANCE IN CRIMINAL MATTERS

The Government of the United States of America and the Government of the Kingdom of Belgium, desiring to

conclude a Treaty on mutual legal assistance in criminal matters,

Have agreed as follows:

ARTICLE 1.--SCOPE OF APPLICATION

1. The Contracting States shall provide, in accordance with the provisions of this Treaty, mutual legal

assistance in all matters relating to the investigation, prosecution and suppression of offenses.

2. Assistance shall include, but not be limited to:

(a) locating [*13] or identifying persons;

(b) serving documents;

(c) providing information and items, including documents, records and articles of evidence;

(d) taking testimony and producing documents;

(e) executing requests for search and seizure;

(f) transferring persons in custody for testimonial or other purposes;

(g) locating, tracing, immobilizing, seizing and forfeiting proceeds of crime; and

(h) assuring restitution to victims of crime.

3. Unless otherwise provided by this Treaty, assistance shall be provided for any offense under the laws of the
Requesting State.

4. This Treaty is intended solely for mutual legal assistance between the Contracting States. The provisions

of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude

any evidence, or to impede the execution of a request.

ARTICLE 2.--LOCATING OR IDENTIFYING PERSONS

The Requested State shall make thorough efforts to ascertain the location or identity of persons specified in

the request.

ARTICLE 3.--SERVING DOCUMENTS

1. The Requested State shall cause service of any legal document transmitted for this purpose by the

Requesting State.

2. Any request for the service of a document [*14] requiring the appearance of a person before an authority

in the Requesting State shall be transmitted a reasonable time before the scheduled appearance.

3. The Requested State shall return as proof of service a dated receipt signed by the person served or a

declaration signed by the officer making service, specifying the form and date of service.

ARTICLE 4.--APPEARANCE OF WITNESSES AND EXPERTS IN THE REQUESTING STATE

1. If the Requesting State considers that the personal appearance of a witness or expert before its judicial

authorities is particularly necessary, it may so state in its request, and the Requested State shall invite the

witness or expert to appear. The Requested State shall promptly inform the Requesting State of the reply of

the witness or expert.

2. The witness or expert shall be approximately reimbursed by the Requesting State for travel expenses and

subsistence incurred in complying with the request. If the witness or expert so requests, the Requesting State

may provide an advance with respect to those travel expenses and subsistence; this advance may be

provided through its embassy in the Requested State.

3. The witness or expert who has failed to answer a summons [*15] to appear, service of which has been

requested, shall not be subjected to any punishment or measure of restraint in the Requested State, even if

the summons contains a notice of penalty.

ARTICLE 5.--PROVIDING INFORMATION AND ITEMS IN THE POSSESSION OF GOVERNMENT OFFICES OR
AGENCIES

Upon request and for the purposes of this Treaty:

(a) the Requested State shall provide publicly available information and items, including documents

or records, in the possession of a government office or agency;

(b) the Requested State may provide information and items, including documents or records, in the

possession of a government office or agency, but not publicly available, to the same extent and under the same conditions as it would be available to its own law enforcement or judicial authorities. The Requested State in its discretion may deny the request entirely or in part.

## ARTICLE 6.--TAKING TESTIMONY AND PRODUCING DOCUMENTS IN THE REQUESTED STATE

1. A person from whom evidence is sought shall, if necessary, be compelled by subpoena to appear and to

testify or to produce items, including documents, records and articles of evidence, to the same extent as in

investigations or proceedings in [*16] the Requested State. Testimonial privileges under the laws of the

Requesting State shall not be taken into consideration in the execution of requests under this Article, but any

such claim shall be noted in the record.

2. On request, the Requested State shall state the date and place of the taking of testimony.

3. At the execution of a request, the Requested State shall permit the presence of the accused, counsel for

the accused, and any other interested person specified in the request.

4. The executing authority shall provide any person permitted to be present the opportunity to pose questions

for the person whose testimony is sought. The questions shall be posed in accordance with applicable

procedures in the Requested State.

## ARTICLE 7.--EXECUTING REQUESTS FOR SEARCH AND SEIZURE

1. To the extent permitted under its laws, the Requested State shall execute a request for the search,

seizure, and delivery of all items, including documents, records and articles of evidence, to the Requesting

State if the request includes the information justifying such action under the laws of the Requested State.

The search and seizure shall be carried out in accordance with the laws of that State. [*17]

2. The Requested State may condition the surrender of the items upon satisfactory assurances from the

Requesting State that the items will be returned to the Requested State as soon as practicable. Without such

a condition, no obligation shall exist to return the items to the Requested State. The Requested State may

also defer the surrender of items needed as evidence in that State.

3. The rights of third parties in such items shall be duly respected.

ARTICLE 8.--PROCEDURES CONCERNING ADMISSIBILITY OF EVIDENCE

1. The Requesting State may ask the Requested State to follow particular procedures in executing a request

under Article 5, 6, or 7 to ensure admissibility of the items produced or seized, and the Requested State shall

follow these procedures, provided they are not prohibited by its laws.

2. The items seized in Belgium shall be held in custody by the office of the court clerk after being

inventoried. Those items will be kept by that office at the disposal of the authorities of the United States of

America. Upon request, that office shall provide, with the items delivered, attestations in compliance with the

form appended to this Treaty and executed by each person having had [*18] possession of the items from

the time of seizure. These attestations shall be admissible in evidence in the United States of America as proof

of the truth of the matters set forth therein; no other attestation shall be required.

3. In the event of special circumstances, the Central Authorities shall consult concerning practical

arrangements relating to the particular procedures to be followed.

ARTICLE 9.--TRANSFERRING PERSONS IN CUSTODY IN THE REQUESTED STATE TO THE REQUESTING STATE

1. A person in custody in the Requested State who is needed for purposes of assistance under this Treaty in

the Requesting State shall be transported to the Requesting State if the person in custody consents and the

Requested State has no reason to deny the transfer.

2. The Requested State may postpone execution of the request for as long as the presence of the person is

necessary for an investigation or proceeding in the Requested State.

3. The Requesting State shall have the authority and obligation to keep the person in custody unless the

Requested State has ordered release.

4. The Requesting State shall return a person not released under paragraph 3 to the custody of the Requested

State as soon as circumstances [*19] permit unless otherwise agreed. The Requesting State shall not

decline to return a person transferred because such person is a national of that State.

ARTICLE 10.--TRANSFERRING PERSONS IN CUSTODY IN THE REQUESTING STATE TO THE REQUESTED STATE

1. For purposes of assistance under this Treaty, the Requesting State may request the transfer to the

Requested State of a person in its custody if the person in custody consents and the Requested State has no

reason to deny the transfer.

2. The Requested State shall have the authority and obligation to keep that person in custody unless the

Requesting State has ordered release.

3. The Requested State shall return a person not released under paragraph 2 to the custody of the Requesting

State as soon as circumstances permit unless otherwise agreed. The Requested State shall not decline to

return the person transferred because such person is a national of that State.

ARTICLE 11.--APPLICATION OF ARTICLES 9 AND 10

1. For purposes of Articles 9 and 10:

(a) The time spent in custody in the State to which a person has been transferred will be deducted from the time remaining to be served in the other State.

(b) The person transferred may not be prosecuted, [*20] detained or subjected to any other restriction of personal liability in the State to which he has been transferred for acts or convictions prior to his transfer.

(c) The immunity provided in sub-paragraph b shall cease if the person transferred:

(i) having had for a period of 15 consecutive days an opportunity to leave the State to which he has been transferred, has remained; or

(ii) having left, has returned.

2. If the transferred person escapes, the State to which he has been transferred shall make every effort to

arrest him.

3. Extradition proceedings shall not be required in order to effect the return of persons transferred under

Article 9 or 10.

ARTICLE 12.--PROCEEDS OF CRIME AND RESTITUTION TO VICTIMS

1. To the extent permitted by its domestic laws applicable at the time that the request is made, each

Contracting State commits itself to grant assistance to:

(a) locate, trace, immobilize, seize and forfeit proceeds of crime; and

(b) assure restitution to victims.

2. The Central Authority of a Contracting State which has reason to believe that proceeds of crime may be

discovered in the other State shall notify the Central Authority of that State which shall determine [*21]

whether any action is appropriate and report as soon as possible on the action taken.

ARTICLE 13.--LIMITATIONS ON ASSISTANCE

1. The Central Authority of the Requested State may deny a request to the extent that:

(a) execution of the request would prejudice the sovereignty, security or other essential public interests of the Requested State;

(b) the request relates to an offense under military law which would not be an offense under ordinary criminal law; or

(c) the request does not comply with the provisions of this Treaty.

2. The Central Authority of the Requested State may also deny a request if it involves a political offense. This
paragraph shall not apply to any offense which the Contracting States may consider not be to a political
offense under any other international agreement to which they are parties.

3. Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall
consult with the Central Authority of the Requesting State to consider whether assistance can be given
subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to
these conditions, it shall comply with the conditions.

4. The [*22] Central Authority of the Requested State may postpone execution of a request or grant it
subject to conditions if execution would interfere with an ongoing investigation or legal proceeding in the
Requested State.

5. The Central Authority of the Requested State shall inform the Central Authority of the Requesting State as
soon as possible of the reason for denying or postponing the execution of a request.

ARTICLE 14.--PROTECTING CONFIDENTIALITY

Upon the request of the Requesting State, the Requested State shall use its best efforts to keep confidential
a request and its contents. If the request cannot be executed without breaching the required confidentiality,
the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State,
which shall then decide whether the request should nevertheless be executed.

ARTICLE 15.--CONTENTS OF REQUESTS

1. A request for assistance shall indicate:

(a) the name of the authority conducting the investigation or proceeding to which the request relates;

(b) the subject matter and nature of the investigation or proceeding;

(c) a description of the information or item sought or the action to be performed; and

(d) the [*23] purpose for which the information, item or action is sought.

2. To the extent necessary and possible, a request shall include:

(a) available information on the identity and whereabouts of a person to be located;

(b) the identity and location of a person to be served, that person's relationship to the proceeding and the manner in which service is to be made;

(c) the identity and location of persons from whom evidence is sought;

(d) a description of the manner in which any testimony is to be taken and recorded;

(e) a list of questions to be answered;

(f) a precise description of the place to be searched and the items to be seized;

(g) a description of any particular procedure to be followed in executing the request; and

(h) information relating to the allowance to which the witness or expert appearing in the Requesting State may be entitled.

ARTICLE 16.--EXECUTING REQUESTS AND RETURN OF ITEMS

1. The Central Authority of the Requested State shall promptly comply with the request or, when appropriate,

transmit it for execution to the authority having jurisdiction, which shall make best efforts to execute the

request. The judicial authorities of the Requested State shall have jurisdiction [*24] to issue subpoenas,

search warrants or other orders necessary to execute the request.

2. Requests shall be executed according to the domestic laws and procedures of the Requested State except

to the extent that this Treaty provides otherwise. Procedures specified in the request, even if unfamiliar to

the Requested State, shall be followed except to the extent specifically prohibited by the laws of the

Requested State.

3. The Requested State may furnish copies of items, including documents, records, and articles of evidence,

obtained in executing a request. Upon application of the Requesting State, the Requested State shall make

every effort to furnish original items.

4. Except as provided in Article 7, the Requesting State shall return any items furnished in execution of

requests for assistance as soon as possible unless the Requested State waives their return.

ARTICLE 17.--CENTRAL AUTHORITIES

1. All requests for assistance shall be made and executed through a Central Authority for each Contracting

State. The Central Authorities of the two States shall communicate directly with each other for the purpose of

carrying out the provisions of this Treaty.

2. For the purposes of this Treaty, [*25] the term "Central Authority" means:

(a) for the Kingdom of Belgium, the Minister of Justice or his representative or delegate;

(b) for the United States of America, the Attorney General or officials designated by him.

ARTICLE 18.--COSTS AND TRANSLATIONS

1. The Requested State shall render assistance without cost to the Requesting State except for fees of

private experts authorized by the request.

2. The Requesting State shall bear all expenses related to the transfer under Articles 9 and 10 of a person in

custody.

3. If during the execution of the request it becomes apparent that expenses of an extraordinary nature are

required to fulfill the request, the Central Authorities shall consult to determine the terms and conditions under

which the execution of the request may continue.

4. Requests under this Treaty shall be provided in English and either French or Dutch; however, letters of

transmission from the Central Authority need not be translated. Attachments to such requests shall be

translated as necessary by the Requesting State. Translation of documents provided pursuant to requests is

incumbent on the Requesting State.

ARTICLE 19.--OTHER TREATIES AND DOMESTIC LAWS

Assistance [*26] and procedures provided by this Treaty shall not impede any assistance or procedure

available under other international conventions or arrangements or under the domestic laws and practices of

the Contracting States.

ARTICLE 20.--ENTRY INTO FORCE AND TERMINATION

1. This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Brussels, as

soon as possible.

2. This Treaty shall enter into force on the first day of the second month after the exchange of the instruments of ratification.

3. This Treaty shall apply to offenses committed before as well as after it enters into force.

4. Either Contracting State may terminate this Treaty at any time by giving written notice to the other

Contracting State. The termination shall be effective six months after the date of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized for this purpose, have signed this Treaty.

DONE at Washington, in duplicate, this twenty-eighth day of January, 1988, in the English, French and Dutch

languages, all three texts being equally authentic.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE KINGDOM OF BELGIUM:

FORM

I, the [*27] undersigned, ___ (Family Name), (Forenames), ___ (Address), ___ (Title or Function), attest on
penalty of criminal punishment for false statements or attestation that I:

--seized the articles listed below from ___ (person) on ___ (date) at ___ (place) *

--received custody of the articles listed below from ___ (person) on ___ (date) at ___ (place) *


- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

* cross out the inapplicable statements

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Description of articles:

I declare that I relinquished custody of those articles on ___ (date) at ___ (place) to: ___ (Name(s)), ___
(Forenames) ___ (Address) ___ (Title or Function).

I declare that, while they were in my custody, these articles were:

--in no way altered. *

--altered in the following manner: *

DONE this ___ day of ___, ___, at ___ (place).

___ (signature)

*The Office of International Affairs\* Department of Justice \* 1301 New York Ave.. NW \* Suite 900 \* Washington, D.C. 20005*

*Last updated by usdoj-crm/mis*
*January 10, 2001*

**BELGIAN REQUEST**



**U.S. Department of Justice**

*Criminal Division*

MEW:RT:PJR:MM:jms
182-17821 (please repeat when responding)

Washington, D.C. 20530

June 10, 2003

### BY TELEFAX AND BY MAIL

Ms. Ilene Jaroslaw
Assistant United States Attorney
U.S. Attorney's Office
147 Pierrepont Street
1 Pierrepont Plaza
19th Floor
Brooklyn, New York 11201
FAX: (718) 254-6481

Ms. Alicia Valle
Assistant United States Attorney
U.S. Attorney's Office
99 N.E. Fourth Street
Miami, Florida 33132
FAX: (305) 530-7087

    Re:     <u>Request from Belgium for Assistance in the Matter of Antoine MEKRI</u>

Dear Ms. Jaroslaw and Ms. Valle:

      Enclosed is a request from Belgium for assistance pursuant to the Treaty on Mutual Assistance in Criminal Matters. In accordance with article 1 of the treaty, your office is hereby designated to render the assistance requested. As the International Security Coordinator (ISC) for your office, you are charged with the responsibility of ensuring prompt and efficient execution of the request.

      K. Thys, Investigating Magistrate at the Court of First Instance in Antwerp, is investigating Antoine MEKRI for fraud. An initial investigation by Belgian authorities has revealed that Antoine MEKRI (alias Antoine Bauer) is the head of OXET Corporation LTD (OXET). OXET ordered approximately $5,540,643.96 worth of pharmaceutical drugs from Cilag International (Cilag). The drugs were shipped from New York on January 30, 2002, and arrived in Antwerp, Belgium, on February 6, 2002. OXET instructed another company, F.J. Tytherleigh (Tytherleigh), to collect and store the drugs. Cilag repeatedly requested payment from OXET, but was never paid. Cilag communicated with Tytherleigh, who claimed that the drugs were still stored with them. On July 12, 2002, Cilag terminated the sales contract and requested return of the drugs. Cilag then found



Records
Chron
File

that the drugs had already been moved and were no longer in the possession of Tytherleigh. Tytherleigh revealed that the drugs were divided into three lots and shipped to the following locations: S.T.C. Trading Company, Ronkonkoma, New York, Finel Express Truckline, Miami, Florida, and Container Care International, Inc., Hialeah, Florida.

The Examining Magistrate at the Court of First Instance in Antwerp has requested the following assistance from U.S. authorities in the Eastern District of New York:

- Interview any available employees from S.T.C. Trading Company regarding their knowledge of the subject matter of this request. Specifically, please determine who collected the containers (bill of lading number B/L/71240410), where the drugs were taken, where the drugs were stored, and on who's orders these tasks were commenced. Also determine whether any of the employees know the current whereabouts of Antoine MEKRI or of the drugs. S.T.C. Trading Company is located at 2060 Ninth Avenue, Ronkonkoma, New York, 11779.

The Examining Magistrate at the Court of First Instance in Antwerp has requested the following assistance from U.S. authorities in the Southern District of Florida:

- Interview any available employees from Finel Express Truckline regarding their knowledge of the subject matter of this request. Specifically, please determine who collected the containers (bill of lading number B/L/71245260), where the drugs were taken, where the drugs were stored, and on who's orders these tasks were commenced. Also determine whether any of the employees know the current whereabouts of Antoine MEKRI or of the drugs. Finel Express Truckline in Miami may be reached by phone at 305-593-7836 or by fax at 305-593-7837.

- Interview any available employees from Container Care International regarding their knowledge of the subject matter of this request. Specifically, please determine who collected containers (bill of lading number B/L/71240400), where the drugs were taken, where the drugs were stored, and on who's orders these tasks were commenced. Also determine whether any of the employees know the current whereabouts of Antoine MEKRI or of the drugs. Container Care International in Hialeah may be reached by phone at 305-688-2811 or by fax at 305-688-1989.

**NOTE:** **Authorize Commissioner Daniel van Doorslaer and Chief Inspector Danny van Campe of the Belgian Federal Police to participate in the execution of the request. They may be contacted directly for further assistance by telephone at 32 3 670 75 37 or 32 3 670 75 36.**

To the extent that the support of an investigative agency is required, please contact the local office of the Federal Bureau of Investigation.

2

The United States submits a substantial number of requests for assistance to Belgium. The continued willingness of Belgian authorities to assist United States prosecutors is preserved by effective and timely execution of Belgian requests. Please keep this office appraised of the progress made in executing this request. I will serve as the main point of contact in this office for both your office and Belgium. **Please contact me at (202) 616-0584, or Marie Maratos, the paralegal assigned, at (202) 514-1856 if you have any questions regarding execution of the request.** If necessary, contact Associate Director Randy Toledo at (202) 616-0546.

This office maintains collections of background materials and pleadings relating to many of the unique legal issues that can arise in the course of executing mutual legal assistance requests. Randy Toledo and I are available to discuss responses to litigation issues encountered in this area. When litigation issues arise, please advise us as soon as possible to ensure that our assistance to you is timely and complete, and that the Department takes consistent, well-considered positions in this rapidly developing area of the law.

Both the Office of International Affairs and the law enforcement authorities in Belgium appreciate your assistance in this international criminal matter.

Sincerely,

Mary Ellen Warlow
Director
Office of International Affairs

By:

Patricia J. Reedy
Trial Attorney

Enclosure : Treaty Request

3



**FEDERAL PUBLIC SERVICE JUSTICE**

DIRECTORATE GENERALOF CRIMINAL LAW
AND HUMAN RIGHTS

**Judicial Cooperation Unit**

Waterloolaan 115 Boulevard de Waterloo
1000 Brussels, BELGIUM

Mrs Patricia Reedy
Trial Attorney
Office of International Affairs
Department of Justice
1301 New York Avenue, NW
Suite 800, Keeney Building
WASHINGTON D.C. 20530
UNITED STATES OF AMERICA

Officer in charge:
Mr. ERIK VERBERT, Deputy Legal Advisor
Tel    ++ 32 2 542 67 59
Fax    ++ 32 2 542 67 67
e-mail    erik.verbert@just.fgov.be

| | |
|---|---|
| Date | : 14 April 2003 |
| CC. | : Luc Clareboets, Liaison Officer |
| Y. Ref. | : |
| O. Ref. | : 6/CRP/02/92.502 |
| Re | : MUTUAL LEGAL ASSISTANCE REQUEST – RE. ANTOINE MEKRI / OXET CORP. LTD |
| Enclosures | : MLAT-REQUEST – INVESTIGATING JUDGE FOR ANTWERP |

Dear Mrs. Reedy,

The Mutual Legal Assistance Unit of the Belgian Ministry of Justice presents its compliments to the Justice Department, Office of International Affairs and has the honor to transmit the following mutual legal assistance request in accordance with the Mutual Legal Assistance Treaty (MLAT) between the United States of America and the Kingdom of Belgium, signed at Washington D.C. on January 28, 1988.

The MLAT-request from the Investigating Judge for Antwerp re. Antoine MEKRI / OXET Corp. Ltd. Following the investigation into a fraud case. Antoine MEKRI a.k.a Antoine BAUER via his company OXET Corp. ordered large amounts of medical drugs. These were to be exported to Russia. Instead the drugs were apparently being shipped to NYC and Miami. MEKRI / OXET never paid for the drugs.

The purpose of this request is to obtain information (documents) from the trading compnaies i New York and Miami.

182—17821

In order to assist United States investigating officials executing this MLAT request, Belgian police officers plan to travel to the United States.

Because of the sensitive nature of this investigation the Ministry requests that American authorities treat this MLAT-request as confidential and, to the extent possible under the laws of the United States of America, prevent public disclosure of any matter relating to its execution, i.e. keep the request under seal.

The Mutual Legal Assistance Unit would appreciate being kept advised of the progress of the MLAT-request, if possible the date the request is transmitted to the competent judicial authority for execution.

The Mutual Legal Assistance Unit thanks the Office of International Affairs in anticipation for the consideration that will be given to this request.

Yours sincerely,
On behalf of the Minister of Justice

ERIK VERBERT
Deputy Legal Advisor

Translation of a document in the Dutch language into English.

**COURT OF FIRST INSTANCE**                     Antwerp, 28th January 2003.
**JUDICIAL DISTRICT ANTWERP.**
**Britselei 55.**
**2000 Antwerp.**
**Belgium.**

**Chamber of K.THIJS**
**Investigating magistrate.**
Tel  (03) 216.52.42.
Fax  (03) 238.30.76.

Dossier  136/02
Memorandum   AN 68.99.1134/00
Appendix: legislation.

### INTERNATIONAL ADMINISRATIVE ORDER

**For the attention of:   The designated judicial authority in the U.S.**

By order of the Public Prosecutor in Antwerp, on the 8th October 2002.my office was
requested to open a judicial investigation against:

> **-1. MEKRI, Antoine,**
> born in Rabaa (Tunisia) on th 22nd January 1951.
> (alias Antoine BAUER).
>
> **-2. OXET CORPORATION LTD** with registered office in 1207
> Geneva (Switzerland), Rue de la Terrassière 14.

For the following:    -Fraud

The facts are punishable, according to Belgian law, for a period of more than one year
imprisonment.

**THE FACTS:**

The company **CILAG AG INTERNATIONAL**, incorporated according to Swiss law,
division of **JOHNSON & JOHNSON FARMACEUTICLS** with registered offices in 6300

A 2 13/2003 - b

Zug (Switzerland) Landys & Gyr Strasse, 1. has on the 23rd September 2002 filed civil proceedings, with the investigating magistrate in Antwerp, against the company, **OXET CORPORATION LTD**, incorporated in the British Virgin Islands, and **Mekri, Antoine**, Place of birth Rabaa (Tunisia) on the 22nd January 1951. (alias **Antoine BAUER**).

**OXET CORPORATION** (hereafter referred to as **OXET**) which has its place of business in 1207 Geneva (Switzerland), Rue de la Terrassière. 14, placed a substantial order on the 15th June 2001 with **CILAG INTERNATIONAL** (hereafter referred to as **CILAG**) for drugs and medicinal products with the brand name TYLENOL and MATRIN. The total value of the order was 5,540,643.96 US $. **OXET** has always claimed that this order was destined for Russia, among others the Red Cross.

The goods were shipped on the 30th January 2002, on instructions given by **CILAG**, in containers from the port of New York (USA) to the port of Antwerp Belgium, where they arrived on the 6th of February 2002. **CILAG** handed over on the 19th February 2002 all the documents to the shipping agency **F.J. TYTHERLEIGH NV** (Hereafter referred to as **TYTHERLEIGH**), with registered offices 2030 Antwerp (Belgium) Noorderlaan 485. This shipping agent acted on instructions received from **OXET** and they took care of collecting and storing the goods. Between **CILAG** and **OXET** was agreed that payment of the goods would be guaranteed via letter of credit. Despite many repeated requests by **CILAG** and many promises made by **OXET** they were never paid the cost price. During the beginning of July 2002 **CILAG** requested **TYTHERLEIGH** if the goods were still located with them, one of the staff of the company verbally answered affirmative, in writing a meaningless answer was given which was dictated by the named Antoine BAUER.

Subsequently, **CILAG** by letter dated 12th July 2002 terminated the purchase agreement, this in accordance with art. 64 paragraph 1, b, of the Vienna convention on the sale of goods and requested return of the goods. As **CILAG**, since the termination of the sales contract, became the owner, they requested, through a magistrates order (that is the magistrate who has jurisdiction over repossession and seizure of goods through a court order), on 15th July 2002 with the magistrate for seizure and repossession of the goods in possession of **TYTHERLEIGH**. The magistrate accepted this request on the same day. Before the bailiff, appointed by **CILAG**, could execute the court order **CILAG** found out that the goods had been moved and were no longer stored in the **TYTHERLEIGH** warehouse.

As one can reasonably assume that **TYTHERLEIGH** had more information over the location of the goods, **CILAG** made on the 16th July 2002 a unilateral request to the President of the business court in Antwerp, consequently the court ordered the appointed bailiff to gather all information with regards to the location or possible location of the goods. **TYTHERLEIGH** then revealed that the goods in question were shipped in three lots, on 18th March 2002 to New York, and to Miami on the 21st March 2002 and on the 15th April 2002.

The manager of **OXTET** had always introduced himself to **CILAG** as **Antoine BAUER**. From investigations carried out by the plaintiff it was evident that this is not his real name and that his name is **Antoine MEKNI**, of French nationality, place of birth Rabaa (Tunisia) on the

22nd January 1951. As a result of further investigations the applicant came into possession of photos of the aforementioned **Antoine MEKNI.** Plaintiff showed these photos to **Elisabeth DYMKOWSKI**, executive officer with **JOHNSON & JOHNSON CONSUMER PHARMACEUTICALS** who recognized the person on the photos as the person who introduced himself to her as **Antoine Bauer.**

According to plaintiff the abovementioned **Antoine MEKRI** had in the past been guilty of fraudulent practices in the pharmaceutical business world and he has an extensive network of companies, amongst others in Russia, Tunisia, France, Greece, Great Britain, Netherlands, Switzerland and the British Virgin Islands. It is claimed that in the past he has used false names **Luc Antoine Balzen/Balsen, Dupont, Lefèvre, Bulsan, Merfi, Meckne, Antonios Makris en Antony Makri** it is claimed that he, as Antonios MAKRIS, is in possession of a Cypriot passport.

As a result of further correspondence between **OXET en CILAG** it has become apparent to plaintiff that there can be no mistake as to the real identity of the accused. In a letter of 31st October 2002 **Antoine MEKRI** on behalf of **OXET** addressed to **CILAG** confirmed that he was the only contact person. He also wrote "The person with whom you have been all the time in contact was and still is our director and head of purchasing for Pharmaceuticals and healthcare products **Dr. Antoine MEKRI** and not **Antoine BAUER**, ..." On the other hand **MEKRI** in the same letter he let it be understood that he never introduced himself as **Antoine Bauer** to CILAG, however in correspondence between **CILAG** and **OXET, Antoine BAUER** was always mentioned.

Through the federal Police in Antwerp, on the base of the information in my file and upon my request, further investigations were made amongst other with the shipping agent **TYTHERLEIGH** in Antwerp and the shipping company **NV ORIENT OVERSEAS CONTAINER LINE (OOCL)** in Antwerp, who took care of shipping the goods to New York and Miami. It has become evident that **TYTHERLEIGH** has continuously been in contact, both verbally and in writing, with **Antoine BAUER** from **OXET** and that they could contact him via the following address PO BOX 6348, 1211 Geneva (Switzerland); via telephone 010 41 22 73 60 293, via fax 010 41 22 73 60 295 and via mobile phone 00 41 79 296 55 44 and that his administrative assistant with **OXET a George PH MUELLER** is.

Furthermore, on the basis of the bills of lading used for shipping these goods, from the port of Antwerp to New York and Miami it is apparent that:

-the containers with bill of lading B/L71240400 were collected from the container terminal in Miami by the company **CONTAINER CARE INTERNATIONAL INC.** Hialeah, Florida (telephone number 305.6882811 and fax number 305.6881989);
- the containers with bill of lading B/L71240410 were collected from the container terminal in New York by the company S.T.C. **TRADING COMPANY**, 2060 Ninth Avenue, Ronkonkoma NY, 11779 (USA)

-the container with bill of lading B/L/71245260 was collected from the container terminal in Miami by the company **FINEL EXPRESS TRUCKLINE,** Miami, Florida (telephone 305.5937836 and fax number 305.5937837)

**OXET** is, according to plaintiff, not established in the British Virgin Islands, as they request for all correspondence to be sent to PO BOX 6348, CH 1211, in Geneva (Switzerland) Also the **OXET** place of business, namely Rue de la Terrassière 14 in 1207 Geneva (Switzerland) is according to plaintiff also fictitious, because the offices of a lawyer **Alberto Fransisco BAUER** are located here.

The offence that **Antoine MEKNI, alias Antoine BAUER as** head of **OXET** committed against **CILAG** can be classified under fraud. He has, in Belgium, under false pretenses (export to Russia and under a false name) handed over a huge quantity of drugs and medicinal products of very high value and most probably not having any intention to pay for these goods.

## REQUEST FOR JUDICIAL ASSISTANCE.

On grounds of the friendly relationship between the United States of America and the Kingdom of Belgium my office requests the following investigation be carried out as requested hereunder, interrogation, searches of premises and the transfer of any possible evidence in order to retrieve the goods.

-Make inquiries with **S.T.C. TRADING COMPANY,** in New York, where the containers, with bill of lading number B/L/71240410, were collected from the New-York container terminal, to interrogate the responsible person in order to ascertain where the goods were taken to, where stored and on who's orders.

-Make inquiries with **FINEL EXPRESS TRUCKLINE,** in Miami Florida (telephone number 305.5937836 and fax number 305.5937837), where the containers, with bill of lading number B/L/71245260, were collected from the Miami container terminal, to interrogate the responsible person in order to ascertain where the goods were taken to, where stored and on who's orders.

-Make inquiries with **CONTAINER CARE INTERNATIONAL INC.** in Hialeah Florida (telephone number 305.6882811 and fax number 305.6881989), where the containers, with bill of lading number B/L/71240400, were collected from the Miami container terminal, to interrogate the responsible person in order to ascertain where the goods were taken to, where stored and on who's orders.

5

-To start an investigation and the interrogation of persons who may be of assistance in order to locate and retrieve the goods and to establish the identity of **Antoine BAUER.**

-To authorize Daniël VAN DOORSLAER, Commissioner of police and Danny VAN CAMPE, Chief inspector of police, both of the FEDERAL POLICE Judicial Department in Antwerp, both are acquainted with the investigation, to be present during the interrogation and investigation.

For any further information regarding this case and any other requests you may contact Daniël VAN DOORSLAER via phone on ++ 32 3 670 75 37 or with Danny VAN CAMPE, Chief Inspector of Police via phone ++ 32 3 670 75 36

I thank you in advance.

Yours faithfully,

The investigating magistrate,

K.Thys

Reference 2002.136.1.

---

End of translation.
Robert May, sworn translator for the Court of First Instance in Antwerp, hereby certifies that this translation is a true copy of the original document in the Dutch language.
31st January 2003.

Robert May
Sworn translator,
Court of first instance Antwerp.

R. May

Verification of signature

Swindle and fraud

496.

He who with the intention to acquire an object that belongs to someone else, has himself delivered or handed over money, moveable property, agreements, receipts or liberation of debts, be it by using false names or qualities, or by applying cunning tricks in order to have believe in the existence of false companies, an imaginary power or an imaginary credit in order to have expected or feared the good issue, an accident or any other schimeric event or to abuse in any other way the guillbility or the confidence, will be punished with incarceration of one month to five years and with a pecuniary fine of twenty-six to three thousand franks.

Attempt to execute the misdemeanour described above will be punished with incarceration of eight days to three years and with a pecuniary fine of twenty-six to two thousand franks.

For ne varietur translation, the sworn translator, Anne-Marie Dewachter

**RECHTBANK VAN EERSTE AANLEG**　　　　Antwerpen, 28 januari 2003
**GERECHTELIJK ARRONDISSEMENT**
**ANTWERPEN**
**Britselei 55**
**2000  Antwerpen**

---

**KABINET  ONDERZOEKSRECHTER**
**K. THYS**
Telefoon　(03) 216.52.42
Telefax　(03) 238.30.76

---

Dossier: 136/02
Notitie: AN 68.99.1134/00
Bijlage: Wetgeving

## INTERNATIONALE AMBTELIJKE OPDRACHT

**Gericht aan : De bevoegde gerechtelijke autoriteiten in de USA**

Bij vordering van de Procureur des Konings te Antwerpen dd. 08.10 2002   werd mijn ambt gelast met een gerechtelijke onderzoek lastens :

- 1. **MEKRI, Antoine**, geboren te Rabaa (Tunesië) op 22.01.1951 (alias Antoine BAUER)
- 2. **OXET CORPORATION LTD** met maatschappelijke zetel te 1207 Genève (Zwitserland), Rue de la Terrassière 14

hoofdens : - Oplichting

De feiten zijn naar Belgisch recht strafbaar gesteld met straffen van meer dan één jaar gevangenisstraf

**DE FEITEN.**

De vennootschap naar Zwitsers recht **CILAG AG INTERNATIONAL**, met divisie **JOHNSON & JOHNSON CONSUMER PHARMACEUTICALS**, met maatschappelijke zetel te 6300 Zug (Zwitserland), Landis + Gyr-strasse 1, heeft op 23.09.2002 bij de Onderzoeksrechter te Antwerpen klacht met burgerlijke partijstelling ingediend, in verband met de vennootschap naar het recht van de Britse Maagdeneilanden **OXET CORPORATION LTD** en **MEKRI, Antoine**, geboren te Rabaa (Tunesië) op 22.01.1951 (alias **Antoine BAUER**).

**OXET CORPORATION LTD** (hierna **OXET** genoemd) die haar uitbatingszetel heeft te 1207 Genève (Zwitserland), Rue de la Terrassière 14, heeft op 15 juni 2001 bij **CILAG AG INTERNATIONAL** (hierna CILAG genoemd) een grote hoeveelheid geneesmiddelen en medische preparaten met de merknamen TYLENOL en MATRIN besteld. De totale prijs van deze bestelling bedroeg 5.540.643,96 USD. **OXET** heeft

*Ao 13/2003 - l*

steeds voorgehouden dat deze bestelling bestemd was voor Rusland, onder meer het Rode Kruis.

De goederen werden op 30.01.2002 in opdracht van **CILAG** in containers verscheept van de haven van New-York (USA) naar de haven van Antwerpen (België), waar zij op 06.02.2002 aankwamen. **CILAG** bezorgde op 19.02.2002 alle nodige documenten aan het expeditiebedrijf **F.J. TYTHERLEIGH NV** (hierna **TYTHERLEIGH** genoemd), met zetel te 2030 Antwerpen, Noorderlaan 485. Dit expeditiebedrijf handelde in opdracht van **OXET** en zij zorgden voor de ophaling en opslag van de goederen. Tussen **CILAG** en **OXET** was afgesproken dat de betaling van de goederen zou worden gegarandeerd door een "letter of credit". Ondanks veelvuldig aandringen van **CILAG** en herhaalde beloften vanwege **OXET** hebben zij nooit de kostprijs betaald. **CILAG** heeft begin juli 2002 bij **TYTHERLEIGH** navraag gedaan of de goederen zich nog steeds bij haar bevonden en er werd door een medewerker van het bedrijf mondeling bevestigend geantwoord en schriftelijk werd een nietszeggend antwoord gegeven dat door genaamde Antoine BAUER aan hen gedicteerd was geworden.

Vervolgens heeft **CILAG** bij brief van 12.07.2002 de koopovereenkomst met **OXET** ontbonden verklaard overeenkomstig art. 64, lid 1, b, van het Weense Koopverdrag en heeft zij om de teruggave van de goederen verzocht. Daar **CILAG** sinds de ontbinding van de koopovereenkomst opnieuw eigenaar was geworden van de goederen heeft zij op 15.07.2002 bij de Beslagrechter te Antwerpen een verzoekschrift ingediend om verlof tot het leggen van beslag tot terugvordering op betreffende goederen in handen van **TYTHERLEIGH**. De Beslagrechter heeft dit verzoek op dezelfde dag ingewilligd. Alvorens **CILAG** haar gerechtsdeurwaarder de opdracht kon geven tot het leggen van beslag is **CILAG** te weten gekomen dat de goederen werden verwijderd en niet meer opgeslagen waren in de magazijnen van **TYTHERLEIGH**.

Aangezien redelijkerwijze kon worden aangenomen dat **TYTHERLEIGH** meer informatie kon verschaffen over de locatie van de goederen heeft **CILAG** op 16.07.2002 een eenzijdig verzoekschrift ingediend bij de Voorzitter van de Rechtbank van Koophandel te Antwerpen en werd bevolen om aan de instrumenterende gerechtsdeurwaarder alle informatie te verschaffen omtrent de plaats waar betreffende goederen zich bevonden of zouden kunnen bevinden. Door **TYTHERLEIGH** werd dan medegedeeld dat kwestieuze goederen in drie partijen waren verscheept, naar New York op 18.03.2002 en naar Miami op 21.03.2002 en 15.04.2002.

De zaakvoerder van **OXET** heeft zich aan **CILAG** steeds voorgesteld als **Antoine BAUER**. Uit door klager ingestelde onderzoeken is gebleken dat dit niet zijn werkelijk naam is en dat het gaat om **Antoine MEKNI**, van Franse nationaliteit, geboren te Rabaa (Tunesië) op 22.01.1951. Ten gevolge van verder onderzoek is klager in het bezit gekomen van foto's van voornoemde **Antoine MEKNI**. Klager heeft deze foto's voorgelegd aan **Elisabeth DYMOWSKI**, een kaderlid van **JOHNSON & JOHNSON CONSUMER PHARMACEUTICALS** en heeft de persoon op de foto's geïdentificeerd als diegene die zich aan haar heeft voorgesteld als **Antoine BAUER**.

Volgens klager heeft voornoemde **Antoine MEKRI** zich in het verleden nog al schuldig gemaakt aan frauduleuze praktijken binnen de farmaceutische business en beschikt hij over een uitgebreid netwerk van vennootschappen, onder andere in Rusland, Tunesië, Frankrijk, Griekenland, Groot Brittannië, Nederland, Zwitserland en de Britse Maagdeneilanden. Zo zou hij zich in het verleden ook al bediend hebben van de valse namen **Luc Antoine Balzen/Balsen, Dupont, Lefèvre, Bulsan, Merfi, Meckne, Antonios Makris en Antony Makri** en zou hij beschikken over een Cypriotisch paspoort op naam van Antonios MAKRIS.

Ingevolge verdere correspondentie tussen **OXET** en **CILAG** is thans volgens klager gebleken dat er geen betwisting meer kan bestaan omtrent de ware identiteit van verdachte. In een brief van 31.10.2002 heeft **Antoine MEKRI** namens **OXET** aan **CILAG** bevestigd dat hijzelf de enige contactpersoon is geweest. Hij schreef onder meer: "The person with whom you have been all the time in contact was and still is our director and head of purchasing for pharmaceuticals and healthcare products **Dr. Antoine MEKRI** and not **Antoine BAUER**, ..." Anderzijds doet **MEKRI** in dezelfde brief uitschijnen dat hij zich nooit aan **CILAG** als

**Antoine BAUER** zou hebben voorgesteld terwijl in correspondentie tussen **CILAG** en **OXET** steeds sprake was van **Antoine BAUER**.

Door de FEDERALE POLITIE van Antwerpen werd op basis van de gegevens in het dossier in mijn opdracht verder onderzoek ingesteld bij onder meer het expeditiebedrijf **TYTHERLEIGH** te Antwerpen en de rederij **NV ORIENT OVERSEAS CONTAINER LINE (OOCL)** te Antwerpen, die het transport van Antwerpen naar New-York en Miami hebben verzorgd. Er blijkt onder meer dat **TYTHERLEIGH** steeds in communicatie heeft gestaan, zowel mondeling als schriftelijk, met **Antoine BAUER van OXET** en dat zij hem konden bereiken op het adres PO BOX 6348, 1211 Genève; op het telefoonnummer 00 41 22 73 60.293, op het faxnummer 00 41 22 73 60 295 en op het GSM nummer 00 41 79 296 55 44 en dat zijn administratieve medewerker bij **OXET** een genaamde George PH **MUELLER** is.

Verder werd op basis van de verschillende connossementen (bill of lading) van verzending van de goederen van de haven van Antwerpen naar New York en Miami vastgesteld dat:

- de containers met de bill of lading nummer B/L/71240400 werden opgepikt op de containerterminal van Miami door het bedrijf **CONTAINER CARE INTERNATIONAL INC.** Hialeah, Florida (telefoonnummer 305.6882811 en faxnummer 305.6881989);
- de containers met bill of lading nummer B/L/71240410 werden opgepikt op de containerterminal van New-York door het bedrijf **S.T.C. TRADING COMPAGNY**, 2060 Ninth Avenue, Ronkonkoma NY, 11779 (USA);
- de container met bill of lading nummer B/l/71245260 werd opgepikt op de containerterminal van Miami door het bedrijf **FINEL EXPRESS TRUCKLINE**, Miami, Florida (telefoon 305.5937836 en faxnummer 305.5937837).

**OXET** is volgens klager niet in werkelijkheid gevestigd op de Britse Maagdeneilanden, daar zij verzoekt van alle briefwisseling te verzenden naar PO BOX 6348, CH 1211 Genèva. Ook is de uitbatingzetel van **OXET** in Zwitserland, namelijk Rue de la Terrassiére 14 te 1207 Genève, volgens hen eveneens fictief, omdat daar een kantoor is gevestigd van advocaat **Alberto Francisco BAUER**.

De feiten die **Antoine MEKNI, alias Antoine BAUER**, als hoofd van **OXET** heeft gepleegd ten nadele van CILAG kunnen ondermeer gekwalificeerd worden als oplichting. Hij heeft zich immers onder valse voorwendselen (uitvoer naar Rusland en onder een valse naam) in België een partij geneesmiddelen en medische preparaten voor een aanzienlijke waarde doen afgeven zonder dat hij ooit allicht de intentie heeft gehad deze goederen te betalen.


## VERZOEK TOT RECHTSHULP.

Op grond van de vriendschappelijke betrekkingen tussen de V. S. van Amerika en het Koninkrijk België verzoekt mijn ambt te willen overgaan tot de uitvoering van de hiernabepaalde onderzoeksdaden, verhoren, huiszoekingen en overdracht van de eventuele overtuigingstukken ten einde de goederen op te sporen:

> - in New-York navraag te doen bij het bedrijf **S.T.C. TRADING COMPAGNY** waar de containers met bill of lading nummer B/L/71240410 werden opgepikt op de containerterminal van New-York en er een verantwoordelijke te verhoren, ten einde te vernemen waar de goederen naar toe werden gebracht en gestockeerd en in wiens opdracht dit gebeurde;

> - in Miami navraag te doen bij het bedrijf **FINEL EXPRESS TRUCKLINE**, Miami, Florida (telefoon 305.5937836 en faxnummer 305.5937837) waar de containers met bill of lading nummer B/l/71245260 werden opgepikt op de containerterminal van Miami en er een verantwoordelijke te verhoren, ten einde te vernemen waar de goederen naar toe werden gebracht en gestockeerd en in wiens opdracht dit gebeurde;

- in Miami navraag te doen bij het bedrijf **CONTAINER CARE INTERNATIONAL INC.** Hialeah. Florida (telefoonnummer 305.6882811 en faxnummer 305.6881989) waar de containers met de bill of lading nummer B/L/71240400 werden opgepikt op de containerterminal van Miami en er een verantwoordelijke te verhoren, ten einde te vernemen waar de goederen naar toe werden gebracht en gestockeerd en in wiens opdracht dit gebeurde;

- Alle andere onderzoeken in te stellen en personen te verhoren die nuttig zouden kunnen zijn ten einde de goederen op te sporen en terug te vinden en ter identificatie van **Antoine BAUER.**

- Toe te laten dat Daniël VAN DOORSLAER, Commissaris van Politie en Danny VAN CAMPE, Hoofdinspecteur van politie, beiden van de FEDERALE POLITIE /GDA ANTWERPEN te Antwerpen en die bekend zijn bij het onderzoek, bij de verhoren en de onderzoekshandelingen zouden aanwezig zijn.

Voor verdere inlichtingen en praktische afspraken kan contact worden opgenomen met Daniël VAN DOORSLAER op het telefoonnummer ++ 31 3 670. 75 37 of met Danny VAN CAMPE, Hoofdinspecteur van politie op het telefoonnummer ++ 31 3 670 75 36.

Ik dank U hiervoor bij voorbaat.

Met de meeste hoogachting.



De Onderzoeksrechter

K.Thys

referte : 2002.136.1.

Strafwetboek Hoofdstuk III. BEDROG

Afdeling III. Oplichting en bedriegerij

Art. 496.

Hij die, met het oogmerk om zich een zaak toe te eigenen die aan een ander toebehoort, zich gelden, roerende goederen, verbintenissen, kwijtingen, schuldbevrijdingen doet afgeven of leveren, hetzij door het gebruik maken van valse namen of valse hoedanigheden, hetzij door het aanwenden van listige kunstgrepen om te doen geloven aan het bestaan van valse ondernemingen, van een denkbeeldige macht of van een denkbeeldig krediet, om een goede afloop, een ongeval of enige andere hersensschimmige gebeurtenis te doen verwachten of te doen vrezen of om op andere wijze misbruik te maken van het vertrouwen of van de lichtgelovigheid wordt gestraft met gevangenisstraf van een maand tot vijf jaar en met geldboete van zesentwintig frank tot drieduizend frank.

Poging tot het wanbedrijf omschreven in het eerste lid wordt gestraft met gevangenisstraf van acht dagen tot drie jaar en met geldboete van zesentwintig frank tot tweeduizend frank.

In de gevallen in de vorige leden omschreven kan de schuldige bovendien worden veroordeeld tot ontzetting van rechten overeenkomstig artikel 33.